Filed 12/18/15  Linda B. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LINDA B. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>        Respondent;<br><br>SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT et al,<br><br>        Real Parties in Interest. | A146375<br><br>(Solano County<br>Super. Ct. No. J42530) |

Linda B. (mother) and Christopher S. (father) petition this court for extraordinary writ review of a juvenile court order setting a hearing under Welfare and Institutions Code section 366.26 for their son, E.S.[1]  Both contend there was insufficient evidence to support the juvenile court's (1) termination of reunification services and (2) finding that they were provided reasonable services.  We disagree and deny the petitions.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In April 2014, the Solano County Health and Social Services Department learned that the maternal grandmother of three-year-old E.S. was caring for him and had filed a

---

[1] All further statutory references are to the Welfare and Institutions Code.

petition for temporary guardianship. Grandmother reported to the Department that mother and father were addicted to methamphetamine and were not properly caring for E.S. Grandmother had obtained guardianship of three older daughters of mother's in 2003 because mother was failing to care for them as a result of drug abuse. Grandmother also reported that father was physically and verbally abusive to mother and had recently held a gun to mother's head. According to grandmother, mother and father had attacked her the previous year over a rent dispute, and she had obtained a restraining order against them. When interviewed, mother and father denied having engaged in any violent behavior. Father also denied recent drug use, but mother admitted to using marijuana to self-medicate her bipolar disorder and to using methamphetamine a few weeks before.

Grandmother soon obtained temporary guardianship of E.S., and he remained in her care. Meanwhile, father was arrested and incarcerated after he assaulted his landlord, locked him in a bedroom, and stole his cell phone. In June 2014, the Department filed a petition alleging that the juvenile court had jurisdiction over E.S. under section 300, subdivisions (b) and (g) because both parents had substance-abuse problems impairing their ability to parent E.S., mother had unmet mental-health needs, and father was in jail because of his violent behavior. The court ordered E.S. detained, and he remained with grandmother. It also ordered mother and father to have supervised visits with E.S. and to receive alcohol and drug testing, substance-abuse treatment, and mental-health referrals.

At the jurisdiction/disposition hearing two months later, the juvenile court found true the allegations under section 300, subdivision (b) that both parents had substance-abuse problems impairing their ability to parent E.S. and the allegation under section 300, subdivision (g) that father was incarcerated, but it dismissed the allegation involving mother's mental health. The court found that returning E.S. to mother and father would pose a substantial danger to him, and E.S. remained in grandmother's care.

The proposed case plan required mother to participate in a domestic-violence program and therapeutic visitation services (TVS), undergo alcohol and drug testing, complete a substance-abuse assessment and follow its recommendations for treatment, and attend services related to E.S.'s individualized education plan (IEP) to address his

speech delay. Father was required to participate in the same services, except those related to the IEP. When presented with the case plan, father indicated that he was willing to participate in reunification services but mother indicated that she was not. The juvenile court ordered services to be provided as proposed in the plan and continued supervised visits for both parents.

The six-month-review report prepared in February 2015 indicated that mother had made some progress in obtaining mental-health services but had not yet arranged for any counseling to address domestic-violence issues. And although she had completed a substance-abuse assessment, she was discharged from the recommended outpatient treatment for not attending, and she had yet to complete a new assessment. During the reporting period, mother failed to appear for alcohol and drug testing twice, tested positive for marijuana or THC five times, and tested positive for methamphetamine once.

Mother visited E.S. regularly, and "some visits [were] uneventful with . . . mother playing appropriately and providing appropriate re-direction of [E.S.] when needed." Other visits were "of concern," however, because mother had threatened to take E.S. and left a suicide note in his pocket. She participated in at least one of E.S.'s IEP meetings, but she refused to participate in TVS. The report recommended that mother continue to receive services, recognizing that she needed more time to stabilize her mental health so she could take advantage of other services.

Father, who was still incarcerated, had enrolled in a six-week program that provided individual counseling and classes on anger management, parenting, and relapse prevention. He had monthly visits with E.S. at the detention facility. The six-month-review report recommended that he also continue to receive services.

At the six-month-review hearing in March 2015, the juvenile court found that both parents had made minimal progress toward alleviating or mitigating the causes necessitating E.S.'s placement outside the home. It continued services as reflected in the updated case plan, which added the requirement that mother see a psychiatrist and take all prescribed psychotropic medication. Supervised visitation for both parents was also continued.

3

The 12-month-review report prepared in late July 2015 reflected that mother's behavior and substance abuse continued to be "of concern." Mother had attended some psychiatric appointments and was prescribed medication, but she reported that she did not consistently take it and that she felt "overwhelmed." She participated in a few individual counseling sessions, but the provider discharged her in March after she failed to attend other appointments.

Mother began TVS with E.S. in February, but in March she cancelled a visit and informed the social worker and visitation supervisor that "she would no longer be participating in supervised visitation with [E.S.] or attend[ing] case plan services." She resumed TVS in April, but at a meeting the following month to discuss visitation, she "appeared unable to control her mood" and told the social worker "that she and [father] had decided to give . . . grandmother custody of [E.S.] in order to end the case."

Mother began interactive speech therapy with E.S. in February as well, but she was soon discharged from the program because she did not appear "ready to participate in services." After being permitted to begin the program again, she almost immediately sought to quit because "she was feeling overwhelmed." Meanwhile, in early April, the program again stopped allowing her to attend because "she was slamming doors, shouting, and had caused an uproar," and her behavior "was negatively affecting [E.S.]."

Between late January and mid-July 2015, mother had 21 alcohol and drug testing appointments, 12 of which she missed. The remaining tests were all positive for marijuana, THC, amphetamines, and/or alcohol. Mother complained that it was hard for her to appear for tests because they required her to travel from Vallejo to Fairfield, but she refused the Department's offer of transportation assistance. Mother did participate in some substance-abuse services from April through June. She entered a residential treatment program in late June, but she left after less than a week, claiming that "there were women getting 'high' [there] and this was causing her anxiety and she chose to leave." Mother entered another residential treatment program, Shamia, in mid-July.

Father was released from the detention facility at the beginning of May, having completed the six-week counseling and education program. He completed a substance-

4

abuse assessment and entered an "intensive outpatient treatment" program. After leaving custody, he appeared for all his scheduled alcohol and drug tests and tested negative each time. Father also requested visitation and began participating in TVS with E.S. He did not, however, begin a domestic-violence program during the reporting period.

The 12-month-review report recommended that the juvenile court terminate mother's and father's reunification services and set a hearing under section 366.26 while continuing to permit supervised visitation. The report acknowledged mother's "recent efforts," particularly in addressing her substance-abuse issues. But it found it "unlikely that . . . mother would . . . benefit from additional family reunification services" because her "behavior during [the] reporting period [was] unpredictable, scattered, [and] disorganized," and she had "an inability to maintain her moods or regulate her behavior." As for father, "the risk [posed by] reunification . . . continue[d] to be high in part because [he] need[ed] to demonstrate his ability to sustain a lifestyle free of substance abuse and crime for a significant amount [of] time in order to safely care for [E.S.]." Mother and father's ongoing relationship was also a concern, and the report stated it was unclear that "father would . . . be able to maintain appropriate boundaries with . . . mother . . . to ensure [E.S.'s] safety" if additional services were offered to father only. Moreover, both parents had expressed the desire that E.S. remain in grandmother's care.

A contested 12-month-review hearing was held in mid-September 2015. Mother testified that she had been sober since June 26. She was set to complete her treatment and leave Shamia the following month, and she agreed that it was best if E.S. stayed with grandmother until then. Mother testified that she then planned to find an apartment, even though she had been unable to maintain stable housing before entering Shamia and her income had not increased.

The social worker testified that mother was taking her psychiatric medication because it was administered by Shamia staff but had not participated in "counseling services or therapeutic services" since March. Although part of the group programming at Shamia "touch[ed] on" domestic-violence issues, the social worker opined that it was "not sufficient" to meet mother's case plan requirement of addressing those issues.

5

Mother had told the social worker "that the only reason she was participating in a residential treatment program was to get her son back and to fulfill the case plan service component of participating in treatment." The social worker was also concerned that mother planned to complete only three months at Shamia instead of the standard six months, especially given her previous lack of success with outpatient substance-abuse treatment and inconsistency in taking her medication. Throughout the case, mother had blamed the Department or her family for E.S.'s dependency and had been unable to accept responsibility.

The social worker testified that father had successfully completed a three-month outpatient substance-abuse program. He had also very recently begun a domestic-violence program. Although the social worker acknowledged that father had made progress, she recommended that his services nevertheless be terminated. She explained that she "ha[d] to consider not only [his] progress in services, but also [mother's] progress in services" because father planned to resume working, and mother would be E.S.'s primary caregiver. Father's failure to demonstrate any "concern with [mother's] ability to care for [E.S.]" was troubling because of mother's persistent mental-health and substance-abuse issues. Father had also told the social worker several times, including in the week before the hearing, that he wanted grandmother to have guardianship of E.S.[2]

The juvenile court found that mother had made minimal progress and father had made adequate progress toward alleviating or mitigating the causes necessitating E.S.'s placement outside the home. It observed that mother's and father's indications that they did not want to continue to participate in services and their belief that E.S. was "best off with his grandmother" amounted to "an acknowledgment that they realize . . . that they're not going to be able to complete the things they need to do in the next three months"— the time remaining before an 18-month-review hearing—and "need more time [than that] . . . to be able to . . . get back on their feet and . . . be in a position where they would

---

[2] Father briefly took the stand and confirmed that he had previously told the social worker he no longer wanted to participate in services, but his current desire was to continue services and eventually regain custody of E.S.

be able to parent [E.S.]." The court then found that E.S.'s return to either parent would create a substantial risk of detriment to E.S. and that the Department had provided or offered reasonable services to mother and father. It terminated mother's and father's reunification services, continued supervised visitation, and set a selection-and-implementation hearing under section 366.26 for January 12, 2016.

II.

DISCUSSION

A.     *Sufficient Evidence Supports the Juvenile Court's Implicit Finding that There Was Not a Substantial Probability of E.S.'s Return to His Parents' Custody if Services Were Extended.*

Mother and father claim that the juvenile court's termination of reunification services is not supported by substantial evidence. They contend that services should have been extended based on the progress they made on their case plans. Although we recognize that both parents, especially father, made progress on their case plans, substantial evidence supported the juvenile court's implicit finding that extending services was not likely to result in E.S.'s return to either parent's custody.

At the 12-month-review hearing, the juvenile court must order a child returned to a parent's physical custody unless it finds that the social services agency has proven by a preponderance of the evidence that the child's return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f); Cal. Rules of Court, rule 5.715(b)(1).[3]) When, as here, the court finds a substantial risk of detriment and court-ordered services have already been provided for the statutorily required time period (see § 361.5, subd. (a)(1)(A)), the court may continue services "for up to six months for a permanency review hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken from the [parent's] physical custody, . . . if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g)(1);

---

[3] All further rule references are to the California Rules of Court.

rule 5.715(b)(4)(A).) To find a substantial probability of return, the court must find that a parent has: (1) consistently contacted and visited the child; (2) "made significant progress in resolving problems that led to the child's removal from the home"; and (3) "demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1); rule 5.715(b)(4)(A)(i).) Thus, although the statute "recognizes a parent who still poses a risk of detriment at the 12-month hearing could with additional time successfully rehabilitate and reunify," it "set[s] a very high hurdle for continuing the case beyond 12 months." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059-1060.)

We review the juvenile court's implicit determination that there was not a substantial probability of E.S.'s return to either parent for substantial evidence. (See *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) In doing so, "we review the record in the light most favorable to the court's determination[] and draw all reasonable inferences from the evidence to support" the determination. (*Ibid.*) It was undisputed below that mother and father had satisfied the visitation prong. We therefore consider whether there is substantial evidence that either of the remaining two prongs was not met.

Mother argues that insufficient evidence supports the juvenile court's termination of reunification services because "[t]he record is replete with examples of significant and consistent progress . . . following her move into residential treatment at Shamia."[4] She entered Shamia only two months before the 12-month-review hearing, however, and she fails to address her lack of progress in the year preceding her entry. Even if we were to

---

[4] Mother cites a number of inapplicable authorities addressing when reunification services may be extended. (§ 361.5, subd. (a)(4) [at 18-month-review hearing, services may be extended up to 24 months after removal]; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016-1017 [juvenile court has discretion to continue 18-month-review hearing if reasonable services have not been provided]; *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1792, 1795-1796 [same].) We construe her argument as involving whether there was no substantial probability of return under section 366.21, subdivision (g)(1).

assume that mother was finally on the right track, her lack of effort until that late date permitted the juvenile court to find she had not made sufficient progress in addressing the problems that led to E.S.'s removal. Moreover, mother does not explain how her progress at Shamia established that she had the capacity to provide for E.S.'s safety and well-being. She repeatedly indicated that she was not fully committed to continuing services, had not accepted responsibility for her role in E.S.'s dependency, and did not have a solid plan for taking care of E.S. should he be returned to her care. She therefore fails to convince us that the court's determination should be reversed.

Father contends that he made significant progress toward resolving the problems that led to E.S.'s removal and demonstrated his ability to provide for E.S.'s safety and well-being because he was no longer incarcerated, had completed substance-abuse programs and was maintaining his sobriety, and had begun domestic-violence services. We agree that father made progress on his case plan, particularly in the four months after his release from custody, and he deserves credit for doing so. But even though father demonstrated progress in remedying the problems that led to E.S.'s removal, father does not explain why his relatively recent compliance with his case plan precluded the juvenile court from finding he had not sufficiently demonstrated his ability to provide for E.S.'s safety and well-being. Father had had limited time since his release to demonstrate that he could live a stable, drug-free life, was ambivalent about continuing to participate in services, and intended to co-parent E.S. with mother despite her significant ongoing problems. We conclude that this evidence was sufficient to support the court's determination that there was not a substantial probability of E.S.'s return to father's custody.

### B. Mother's and Father's Objections to the Finding that They Were Provided or Offered Reasonable Reunification Services Lack Merit.

Mother and father contend that the order setting a section 366.26 hearing must be reversed because the juvenile court improperly found they were provided or offered reasonable reunification services. We conclude that they forfeited their claims by not

raising the issue before the 12-month-review hearing and that the claims also fail on the merits.

If the juvenile court does not order a minor to be returned to a parent's custody at the 12-month-review hearing, it must "determine whether reasonable services that were designed to aid the parent . . . to overcome the problems that led to the initial removal and continued custody of the child have been provided or offered to the parent." (§§ 361.5, subd. (a)(3), 366.21, subd. (f).) The court may not set a hearing under section 366.26 and must extend family reunification services unless it finds by clear and convincing evidence that reasonable services were provided. (§ 366.21, subd. (g)(1)(C); rule 5.708(m).) We review a finding that reasonable services were provided for substantial evidence, which requires us to "review[] the evidence in a light most favorable to the prevailing party and indulg[e] in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)

A social services agency is required to "make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the . . . agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) "The adequacy of reunification plans and the reasonableness of [the agency's] efforts are judged according to the circumstances of each case." (*Ibid.*) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.)

Parents have an obligation to timely contest the provision of reunification services. "[A] parent [may not] wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.) Here, there is no

10

indication in the record that either mother or father objected to the adequacy of services at any time before the 12-month-review hearing, and they offer no excuse for their failure to do so. Indeed, mother did not even raise the issue at that hearing. As a result, their claims are forfeited.

Even if these claims had been preserved, they would fail on their merits. Mother argues that the Department did not offer her "services . . . to assist her in obtaining further treatment" before she entered Shamia or give her "referrals to . . . additional service provider[s] to assist [her] in her reunification goals" after she entered Shamia, even though the Department "opined that [her] full compliance with program requirements at [Shamia] was not sufficient." She fails to specify, however, which additional services she believes she should have received before entering Shamia, and we are therefore unable to evaluate that aspect of her claim. As for her participation in services after entering Shamia, the Department primarily took issue with her lack of participation in mental-health and domestic-violence counseling. To the extent mother contends that she was not offered or provided such services, the record belies her position. Both types of services were part of her case plan, and the Department repeatedly urged her to participate in them during the year before she entered Shamia. Her failure to participate in those services when she had the opportunity to do so did not trigger any additional obligation of the Department. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 414 [" 'The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions' "].) Substantial evidence supports the juvenile court's finding that reasonable services were provided to mother.

Father argues that the Department failed to "provide him with reasonable domestic violence counseling services" after the six-month-review hearing in March 2015. First, he claims he should have "been provided with domestic violence counseling while he was in custody" for the period between mid-March and early May, when he was released.

11

But this claim fails because the record does not establish that these services were even available in the facility in which he was incarcerated.

Second, father claims the Department failed to provide him with domestic-violence counseling after his release because the social worker only provided him with a resource sheet and did not "promptly follow up" after he asked to complete such services through his outpatient substance-abuse program. The record reveals that the social worker provided father with a list of potential providers and phone numbers on May 8, a week after his release. On June 8, he informed the social worker he had been too busy with his other services to begin domestic-violence counseling and asked her to send the resource sheet again. Then, on June 26, he told the social worker he had not yet called any of the listed providers and preferred to complete such counseling through his substance-abuse program. On July 6, she informed him that she had been unable to arrange for him to do so and relayed the program's recommendation that he "complete his treatment with the substance abuse counselor instead of being assigned to a mental health counselor for [domestic-violence counseling] at this time." Three days later, she learned that domestic-violence counseling was not, in fact, available through the program, and father's counselor promised to "inform [father] so that he could begin with [domestic-violence] counseling elsewhere." Ultimately, father began a 13-week program in late August, about four months after his release.

Thus, the record shows that father let seven weeks pass without making any arrangements before he told the social worker he wanted to try to complete domestic-violence counseling through his substance-abuse program. And after it became apparent he could not do so, almost two more months passed before he started a domestic-violence program. Father does not explain what more the social worker should have done, especially since he had reported that he felt too busy to attend domestic-violence counseling in the weeks following his release. Ultimately, he was the one who chose to wait to begin those services until he had finished his substance-abuse program. We conclude that there was substantial evidence that he was offered reasonable domestic-violence services.

Father also argues that the Department failed to provide "individual counseling to address his lack of insight pertaining to mother's parenting ability." (Boldface omitted.) Father received individual counseling and parenting classes while he was incarcerated, yet he continued to believe that mother was a "good mom" and wanted her to be E.S.'s primary caregiver if E.S. was returned. Moreover, even if additional counseling would have been effective, there is no indication that father was willing to assume primary responsibility for E.S. if E.S. could not be safely returned to mother. Under these circumstances, the Department was not required to provide additional services to father to address his lack of insight about mother.

III.
DISPOSITION

The petitions for extraordinary writ relief are denied on the merits. (Rule 8.452(h)(1); see § 366.26, subd. (*l*).) The request for a stay of the selection-and-implementation hearing under section 366.26 scheduled for January 12, 2016, is denied as moot. This decision shall be final immediately in the interests of justice. (Rules 8.452(i), 8.490(b)(2)(A).)

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.

13